**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

ELECTRONICALLY
FILED
Apr 30 2026
U.S. DISTRICT COURT
Northern District of WV

STEWARDS OF THE POTOMAC HIGHLANDS, )
P.O. Box 232                          )
Maysville, WV 26833                   )
                                      )
VIRGINIA WILDERNESS COMMITTEE         )
P.O. BOX 7257                         )
Richmond,, VA   23221                 )
                                      )
                                      )
                        Plaintiffs,   )
                                      )
                                      )
      v.                              )
                                      )
                                      )
SEAN DUFFY, SECRETARY                 )
U.S. DEPARTMENT OF TRANSPORTATION     )
400 7th Street, S.W.                  )
Washington, D.C.  20590               )
                                      )
                                      )
SEAN McMASTER, ADMINISTRATOR          )
FEDERAL HIGHWAY ADMINISTRATION        )
400 7th Street, S.W.                  )
Washington, D.C.  20590               )
                                      )
                                      )
JOHN ROGERS, PHD, P.E.,  ACTING       )
WEST VIRGINIA DIVISION                )
ADMINISTRATOR                         )
FEDERAL HIGHWAY ADMINISTRATION        )
300 Virginia Street East, Suite 7400  )
Charleston, WV 25301                  )
                                      )
                                      )
STEPHEN TODD RUMBAUGH, SECRETARY      )
State Highway Engineer                )
WEST VIRGINIA DEPARTMENT OF           )
TRANSPORTATION                        )
Division of Highways                  )
State Capitol Complex, Building 5     )
1900 Kanawha Blvd. E                  )
Charleston, WV  25305                 )
                                      )
                                      )
                        Defendants.   )
                                      )

**CIVIL ACTION:  2:26-CV-21**

CA No. 5:26-cv-11111

**COMPLAINT FOR**
**DECLARATORY AND**
**INJUNCTIVE**
**RELIEF**

1

INTRODUCTION

1. Plaintiffs bring this action to challenge the decision of Defendants to construct a 6.8-mile segment of Appalachian Corridor H, a four-lane divided highway from Wardensville, West Virginia to the Virginia state line.  Often called "the road to nowhere," Corridor H was advanced by the Defendants in 1981 as a federal-aid highway project, as a 110-mile highway from Elkins, West Virginia to Strasburg, Virginia. The Defendants' original approval of the project was struck down by the U.S. Court of Appeals for the DC Circuit in 1999, later pared down to 100 miles. In 2000, Defendants agreed to divide Corridor H into nine separate projects that would be advanced as independent projects, including the Wardensville to Virginia project.

2. The 6.8 mile Wardensville to Virginia state line segment of Corridor H, now estimated to cost $542 million, would adversely affect (and possibly destroy) the character of the historic town of Wardensville, considered the "Gateway to the Mountains," and impact the lives of homeowners and farms in its path. This easternmost section of Corridor H would cross through the iconic George Washington National Forest and bypass and severely impair the economy of Wardensville's historic Main Street district. The far-reaching consequences of this project will have economic, environmental, and other ripple effects decades—indeed, centuries—into the future.

3. The Warrensville to Virginia segment of Corridor H was advanced based on environmental and transportation studies conducted more than 35 years ago. Notably, the justification for rejecting the alternative of making spot improvements for the entire 100-mile highway was used as the basis for rejecting this alternative for the 6.8-mile segment. The need for a four-lane highway for this segment of Corridor H is based on projections of future daily traffic that are demonstrably wrong, and on rationales extrapolated from studies conducted 40 years ago for the entire 100-mile Corridor H highway project that are not supported by current traffic studies conducted expressly for this segment of Corridor H. The Defendants' failure to evaluate the less destructive and vastly less expensive alternative of making spot improvements to existing roads violates the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370(d). The FHWA also failed to evaluate alternatives that would minimize harm to the Tuscarora Trail, in violation of Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303; 23 U.S.C. § 138.

4. Plaintiffs request injunctive relief preventing the Defendants from taking any action to commence construction of the Warrensville to Virginia segment of Appalachian Corridor H (the "Project"), including the acquisition of right-of-way and the letting of construction contracts, until there has been adequate compliance with the applicable statutory and regulatory requirements of NEPA and Section 4(f).

JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28

3

U.S.C. § 1331(a), 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1361, and 5 U.S.C. §§ 701-706.  Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

<u>PARTIES</u>

6. Plaintiff Stewards of the Potomac Highlands is a nonprofit West Virginia corporation and 501(c)(4) organization formed in 2001 to advocate for the preservation of nature, history and local community economies in West Virginia's eight northeastern counties and adjacent counties. Plaintiff Stewards, which has a mailing address of P.O. Box 232, Maysville, WV 26833, brings this action on behalf of itself and its adversely affected followers.

7. The Potomac Highlands, with its ridges and valleys, unique rock formations and native plants and animals, has a key role in protecting the soil, water and air in the Potomac watershed.  Stewards is committed to defending this region.

8. Plaintiff Stewards and its followers have been actively involved in community organizing and administrative advocacy to secure adequate consideration of the feasible and prudent alternative to building a four-lane Corridor H segment from Wardensville, WV to the Virginia state line, and submitted comments on the project's draft Supplemental Environmental Assessment and preliminary environmental reviews from 2022 through 2025.  Plaintiff sued WVDOH in 2001-2002 for unlawfully designing under-sized sediment control ponds in the section of Corridor H between Moorefield and Baker.

9. Stewards has been actively involved in community organizing and administrative action to secure adequate consideration of alternatives that do not involve the

construction of a new four lane highway and the resulting adverse impacts to historic and environmental resources. These followers have for years used, enjoyed, and appreciated these features, including but not limited to, George Washington National Forest, trout streams including Trout Run and Waite's Run, historic Wardensville Main Street and other local farms and businesses, the Wardensville town drinking water system, Cacapon-Lost River watershed, and the Tuscarora hiking-biking-equestrian trail and other trails atop Great North Mountain, and intend to continue to do so. Their interests in preserving and protecting the historic and environmental resources of the Wardensville area and Great North Mountain will be harmed by the proposed action.

10. Formed in 1969, Virginia Wilderness Committee is a nonprofit Virginia corporation and 501(c)(3) organization of some 500 members, organized to coordinate the work of citizens who are endeavoring to preserve Virginia's outstanding natural areas on federal public lands and to encourage wider appreciation of the natural resources of the Commonwealth.  This includes 1) permanently protecting Virginia's wild places for future generations by advocating their addition to the National Wilderness Preservation System, 2) fostering understanding and appreciation of wilderness, and 3) promoting enjoyment and stewardship of Virginia's wildlands.  Virginia Wilderness Committee, which has a mailing address of P.O. Box 7257, Richmond, VA 23221, brings this action on behalf of itself and its adversely affected members.

11. The Virginia Wilderness Committee and its members have been actively involved in community organizing and administrative advocacy as far back as 1994 to

secure adequate consideration of the feasible and prudent alternative to the Corridor H segment from Wardensville, WV to the VA state line. More recently, in April 2025, the Virginia Wilderness Committee spoke at a WVDOH public hearing in Baker, WV, and in May 2025, submitted comments on the Supplemental Environmental Assessment for the Project. The Virginia Wilderness Committee also collaborated with Stewards of the Potomac Highlands to write and submit extensive, detailed comments to WVDOH that were signed by 14 organizations from Virginia and West Virginia in May 2025. Through these letters and actions, the Virginia Wilderness Committee advocated for adequate consideration of alternatives that do not involve the construction of a new four or five- lane highway and the resulting adverse impacts to nearby historic and environmental resources.

12. Virginia Wilderness Committee members have explored Great North Mountain in the George Washington National Forest and studied its geologic features and other natural characteristics, its water resources, and special species that live there, including the wood turtle, which has been petitioned for listing as an Endangered Species under the Endangered Species Act. In the early 1990s, the Virginia Wilderness Committee identified a 30,000-acre portion of the George Washington National Forest that spans across both sides of the Virginia/West Virginia state line as an area deserving of permanent protection as a Big Schloss National Scenic Area because of its scenic beauty, recreational resources, rich biodiversity, older growth trees, unusual geologic features, and its function as a critical wildlife corridor.

13. The Project would cut through the Big Schloss National Scenic Area proposal and harm the Committee's interest in preserving and protecting the historic and environmental resources of Great North Mountain, placing a portion of the proposed National Scenic Area at risk of disqualification from Congressional designation through degradation of its natural character.  The proposed action would also destroy intact older growth forest, fragment wildlife habitat, lead to Wood turtle mortality by roadkill and loss of habitat, and make the Tuscarora Trail crossing at Rt. 55 more dangerous for hikers, bikers, equestrians, hunters, and other trail users.  Changes caused by the Project would be harmful and irreversible to Great North Mountain and would injure and aggrieve Virginia Wilderness Committee and its members.

14. Members and supporters of plaintiffs' organizations are subject to present and threatened harm attributable to Defendants' decisions to approve construction of Appalachian Corridor H.  A number of plaintiffs' members live and own property in the areas that will be traversed by the proposed highway, and will be harmed by, among other things, the destruction of scenic viewsheds, increased water, air, and noise pollution generated by traffic and increased highway runoff, and the degradation of the area's streams, rivers, and watersheds from construction of the highway, including blasting and borrow-and-fill activities, and the adverse environmental effects of increased development that will result from construction of a four-lane highway in this pristine area.

15. Many of plaintiffs' members and supporters also frequently use, enjoy, and appreciate the George Washington National Forest's rivers, streams, scenic

byways and viewsheds, and cultural resources that will be affected by the challenged action, including the historic town of Wardensville, WV, and but for the proposed project, intend to continue to use, enjoy, and appreciate these resources with the same degree of frequency and regularity for a variety of activities including walking, exploring, hunting, fishing, seeking solitude, and enjoying the scenery, and studying and appreciating the wildlife, history, and environmental processes. The interests of plaintiffs' members in preserving and protecting these scenic, natural, recreational, and cultural resources will be harmed by the proposed action.

16. Plaintiffs and their members and supporters have been actively involved in community organizing, administrative action, and lobbying to secure adequate consideration of alternatives that do not involve construction of a new, four-lane superhighway, and that would meet the purported goals of the proposed project.

17. Given their interest in and advocacy on behalf of protecting the natural and historic resources and undisturbed natural area in the heartland of West Virginia and Virginia, plaintiffs and their members have a strong interest in ensuring that Defendants comply with the procedural requirements of NEPA, and with the procedural and substantive mandates of Section 4(f). The interests of Plaintiffs and their members are within the zone of interests intended to be protected by NEPA and Section 4(f). The interests of Plaintiffs and their members are and will continue to be aggrieved and adversely affected by the actions of Defendants complained of herein. Plaintiffs and their members have suffered and will continue to suffer injury in fact due to the Defendants' current and prospective

failure to comply with NEPA and Section 4(f), unless the relief sought here is granted.  Neither the claims asserted herein, nor the relief requested, requires the participation of individual members of the Plaintiffs in this lawsuit.

18.  Defendant Duffy is named here solely in his official capacity as Secretary of the United States Department of Transportation.  In that capacity, Defendant Duffy is responsible for the administration, operations, and activities of the Department of Transportation, including the Federal Highway Administration (FHWA), and for the Defendants' compliance with NEPA and Section 4(f).

19.  Defendant McMaster is named here solely in his official capacity as Administrator of the FHWA.  In that capacity, Defendant McMaster is responsible for the administration, operations, and activities of the FHWA, and for the agency's compliance with federal laws, including NEPA and Section 4(f).

20.  Defendant Rogers is named here solely in his official capacity as Acting Division Administrator of the FHWA West Virginia Division.  In that capacity, Defendant Rogers is responsible for the administration, operations, and activities of the FHWA in West Virginia, and for the agency's compliance with federal laws, including NEPA and Section 4(f).

21.  Defendant Rumbaugh is sued solely in his official capacity as the Secretary of the West Virginia Department of Transportation, Division of Highways.  In that capacity, Defendant Rumbaugh is responsible for the design and construction of Appalachian Corridor H.

<u>FACTS</u>

22.  Appalachian Corridor H was conceived in 1965, as part of the Appalachian

Regional Development Act of 1965, 40 U.S.C. app. § 2(a), a system of highways intended to foster economic growth, improve infrastructure, and promote development within the 13-state Appalachian region. The original purpose of the Appalachian Regional Development Highway System, as proposed sixty years ago, was "to provide a highway system which will open up an area or areas with development potential where commerce and communication have been inhibited by lack of adequate access." Pub. L. No. 89-3, § 201(a); 72 Stat. 885 (1965).

23. Appalachian Corridor H is one of the last of the Appalachian development highway systems proposed for federal funding due to its high cost, and the difficult terrain and sparse population of the area it will traverse.

24. Appalachian Corridor H was advanced as a federal-aid highway project in 1981, consisting of a four-lane divided highway of 110 miles in length, starting from Elkins, West Virginia and terminating at Interstate 81, in Virginia.

25. The traffic analysis contained in the original, 1994 environmental impact study for Corridor H acknowledged that an existing two-lane roadway would not generally be considered for widening to a four-lane roadway until its Level of Service drops to a LOS D. The maximum ADT that corresponds to a LOS D for two-lane rural roadway is approximately 9,000 vehicles per day. Alignment SDEIS, at II-71

26. At the request of numerous commenters, the 1994 Alignment Selection Draft Environmental Impact Statement ("DEIS") identified an "Improved Roadway Alternative" ("IRA") consisting of construction of a new, two-lane highway with completely uncontrolled access and then rejected the so-called IRA as not

10

meeting the needs for the project.

27. Numerous public and agency commenters objected to the IRA developed by the Defendants. As the U.S. Department of the Interior stated in its comment letter:

> [T]he IRA failed to offer a realistic alternative to the No-Build or 4-lane options. The design constraints resulted in a significant portion (62 percent) of the IRA requiring construction on new alignment or relocation. We envisioned a less intrusive approach that involved road widening and horizontal and vertical curve improvements as reasonably permitted by topographical, environmental, and social constraints.

Letter to Mr. Billy R. Higginbotham, FHWA Division Administrator, from Willie R. Taylor, DoI (April 13, 1995).

28. In 1996, the project was reduced to a 100-mile highway terminating at the West Virginia/Virginia state line after the Virginia Commonwealth Transportation Board ("VCTB") voted to disapprove the construction of Corridor H in Virginia. Instead, the VCTB directed the Virginia Department of Transportation to "study the Route 55 corridor safety aspects such as horizontal and vertical alignments, possible need for truck climbing lanes, intersection safety improvements, and other safety related features of the roadway."

29. As a result of the VCTB's decision, instead of continuing for 14 miles to a terminus at I-81 in Strasburg, VA, Corridor H would transition from four to two lanes to tie into WV Route 55 just west of the WV/VA state line. FEIS, at IV-7. The Final EIS acknowledged that, as a result, the accident rate on VA Route 55 would be expected to increase following construction of the Preferred Alternative due to increased traffic volumes. FEIS at IV-5. The FEIS also stated that "[f]ailure to complete this small section will have little impact on VA 55's efficiency and will allow goods and people to move efficiently between I-79 to

11

the west and I-81 located approximately 22.5 km (14 mi.) east of the WV/VA state line." FEIS, at IV-5 to 6.

30.    The FHWA signed a Record of Decision ("ROD") on August 2, 1996, approving the selection of the preferred alternative for Appalachian Corridor H of constructing a new, 100-mile four-lane highway from Elkins, WV to the Virginia state line.

**1996 Lawsuit Challenging Corridor H**

31.    In 1996, a broad coalition of environmental and historic preservation organizations filed a lawsuit in the U.S. District Court for the District of Columbia alleging that the FHWA's approval of the project violated NEPA and Section 4(f).  The District Court rejected these arguments, and the Plaintiffs filed an appeal.

32.    In 1998, the U.S. Court of Appeals for the DC Circuit enjoined construction of the project, and ultimately held that the FHWA's approval of the project violated Section 4(f) and remanded the case. *Corridor H Alternatives v. Slater*, 166 F.3d 368 (D.C. Cir. 1999).  The Court, however, declined to find that the Defendants had violated NEPA by refusing to examine the IRA as an alternative to the constructing the 100-mile highway.

33.    On February 7, 2000, the parties to the litigation entered into a settlement agreement ("Settlement Agreement.")  The Settlement Agreement, which was approved by the District Court, divided the 100-mile highway into nine separate projects, each of which were deemed to have logical termini and independent utility.  The parties agreed that each of these nine projects would be approved in a

separate Record of Decision (ROD).  One of these segments was a 5.5-mile project (now identified as a 6.8-mile or 7.2-mile project) from the Town of Wardensville on County Route 23/12, 0.2 miles south of WV 55/259, extending east to WV Route 55, at a point approximately 100 feet west of the West Virginia/Virginia Line ("the Wardensville to VA Line project.")

34.    As part of the Settlement Agreement, the Defendants agreed that, while a ROD could be issued for the Wardensville to Virginia Line segment as soon as ongoing historic studies were complete, final design and right-of-way acquisition and construction would be deferred until one of four conditions has been met:

   a. Virginia approves the completion of Corridor H as a four-lane highway from the state line to I-81.
   b. Traffic conditions on WV 55 (from Wardensville to the state line) decline to an unacceptable level - defined as "Level of Service E" - as determined by an independent engineer chosen by both parties.
   c. Funding for the entire Appalachian corridor highway program has been appropriated but must be spent by a date certain.
   d. Twenty years have passed from the effective date of the agreement.

35.    As part of the Settlement Agreement, the Plaintiffs to the 1996 lawsuit agreed to waive the right to bring an action under the Administrative Procedure Act or any other law alleging that FHWA's issuance of the Amended ROD for the Wardensville-to-Virginia Project was not granted in accordance with NEPA, Section 4(f), or any other applicable law or regulation.

36.    Plaintiffs to the 1996 lawsuit also agreed that they would be precluded from providing comments to the Defendants with respect to any segment advocating for an alternative that calls for the improvement of an existing two-lane or three-lane roadway, or the construction of a new two-lane or three-lane roadway, in lieu of the completion of all or a portion of Corridor H as a four-lane, divided

13

highway ("the Improved Roadway Alternative.")

37. Neither Stewards nor VWC were plaintiffs in the original 1996 lawsuit changing the 100-mile Corridor H project and are therefore not bound by the terms of the Settlement Agreement.

38. The Settlement Agreement also acknowledges that the Plaintiffs did not waive the right to challenge any final agency action that occurs after the issuance of the Amended ROD, with respect to any individual Project segment, based on claims that arise after the issuance of the initial Amended ROD for that Project.

**No Further Analysis of Alternatives for the Wardensville to Virginia Line Segment Was Done Following the Issuance of the Amended ROD in 2003**

39. On May 5, 2003, the Defendants issued an Amended Record of Decision ("ROD") approving the Wardensville to Virginia State line segment of Corridor H.

40. On May 5, 2003, the Defendants issued an Amended Record of Decision ("ROD") approving the Wardensville to Virginia State line segment of Corridor H.

41. The Amended ROD stated that "[t]he proposed project would provide enhanced system linkage for various trip purposes in the region; namely, travel to and from work, recreational travel, and goods movement. It will provide direct and improved linkage among the major roadways in the region, namely, WV 55, WV 259N, CR 23/12, and CR 23/10. It will provide "an approximately 5.5-mile-long highway segment free from congestion, multiple driveways, and many geometric deficiencies associated with the existing route."

42. The 2003 Amended ROD concluded that no new studies would be prepared under NEPA based on the 1996 Final EIS for the 100-mile highway project. Nonetheless, the 2003 Amended ROD concluded that the segment would serve a useful transportation purpose independent of the completion of the entire, 100-mile highway, based on the following assertions:

   a. The project would reduce the trip time between the east and west termini by 5 minutes;

   b. While acknowledging that 2003 annual daily traffic counts for two of the three segments of local roadways would be at an acceptable Level of Service ("LOS") C, the projected increase in annual daily traffic counts in 2013 for these sections would result in a LOS "D" or worse;

   c. That the new highway would have a 27 percent lower accident rate, a 33 percent lower injury rate, and a 43 percent lower fatality rate than the corresponding section of WV Route 55; and

   d. That the new facility would remove the majority of truck traffic from the existing facilities and route it to a new four-lane facility with partial control of access would improve level of service and safety in the region.

43. The 2003 Amended ROD acknowledged that the existing ADT on WV 55 between Wardensville and the WV/VA State Line varies from 2,150 to 4,600 vehicles per day, and thus provides an acceptable Level of Service on two out of three segments of Route 55 from Wardensville to the VA border. The 2003

15

Amended ROD projected that increases in AADT in 2013 would degrade the Level of Service on these segments to an unacceptable level.

44.    The 2003 Amended ROD acknowledged that the existing ADT on WV 55 between Wardensville and the WV/VA State Line varies from 2,150 to 4,600 vehicles per day, and thus provides an acceptable Level of Service on two out of three segments of Route 55 from Wardensville to the VA border. The 2003 Amended ROD projected that increases in AADT in 2013 would degrade the Level of Service on these segments to an unacceptable level.

45.    No action was taken by the Defendants to advance the Wardensville to Virginia Line segment of Corridor H under any of the settlement conditions until 2018.

46.    In the 35 years that had passed since the environmental studies that were the basis of the 2003 amended ROD were finalized, numerous significant changes in the project area through which the Wardensville to Virginia line segment passed. These changes included substantial growth of a tourism and outdoor recreation-based economy in this historic town of Wardensville, WV, and a new George Washington National Forest Plan calling for protection of wood turtle habitat and making Rt. 55 a Scenic Corridor in the Plan to be managed for scenic qualities.  In addition, the U.S. Fish and Wildlife Service is now evaluating the wood turtle for listing as an Endangered Species, and the Virginia long-eared bat was listed as Endangered as of March 31, 2023.

47.    In March 2025, the Defendants issued a Supplemental Environmental Assessment ("SEA") for the reevaluation of the May 5, 2003 amended ROD.  The project was described as a 6.8-mile, four-lane partially-controlled access highway.  The SEA

16

evaluated the impact of design changes to the project and intervening changes in the surroundings, planning documents, regulations and protocols.  The public was given an opportunity to comment on the document.

48.    The SEA fails to provide supporting analysis for its conclusion that the project needs can only be addressed by constructing a four-lane divided highway.

49.    For example, the SEA bases the need for the project on 2022 average daily traffic counts, showing that the average annual daily traffic (AADT) volumes for WV 55 (US 48) West of Trout Run Road, carried 4,500 vehicles per day ("vpd"), while WV 259 and WV 55 north of downtown carry 2,200 vpd and 3,100 vpd respectively and WV 55 and surrounding major intersecting roads showed existing AADT volume on WV 55 in Wardensville is 5,100 vpd between Trout Run Road and the intersection of WV 55 and WV 259 north of downtown.  The 2022 AADT demonstrates that, more than 20 years after issuance of the amended ROD, traffic volumes on existing roadways remain substantially the same and these local roads continue to provide an acceptable level of service.  In light of the absence of traffic congestion and flat line growth in traffic volumes in the 20 years since issuance of the Amended ROD,  WV Rt. 48/55 will continue to provide adequate future capacity for projected future traffic and would not warrant reconstruction to a four-lane highway.

50.    The SEA posits that Corridor H will remedy "numerous design deficiencies" with local roads, such as "narrow shoulders and sharp curves, few passing opportunities, and no control of access."  The SEA fails to consider whether these

17

deficiencies could be addressed with spot improvements and/or road reconstruction options.

51.   The SEA asserts that 11 % of the traffic on WV Route 55 is truck traffic and that Corridor H will reduce the trip time for vehicles using the seven miles of local roads from 11 to 6 minutes. On information and belief, these conclusions are not supported by any origin and destination studies that would demonstrate that some or all of these trucks and other vehicles currently using the seven miles of local roads would divert to Corridor H once it is built.

52.   In a significant change from the 1996 plans, the SEA disclosed that the Wardensville to the Virginia line segment would now be designed to force through traffic onto Corridor H by terminating WV 55 at a cul-de-sac near the Virginia border, forcing residents and businesses accustomed to using WV 55 to reach eastern destinations (e.g., Strasburg, Virginia) to use the new facility, accessed farther to the west.

53.   No support is provided for the assertion in the SEA that removal of trucks from WV Route 55 would improve level of service and safety in the region, particularly given the absence of congestion on local roads.

54.   While the SEA notes that "improved roadway alternatives" were considered and rejected on a corridor-long basis in the 1992 NEPA studies for the 100-mile project, no road improvement alternatives or program of spot improvements were evaluated as an alternative during the supplemental environmental review of the Wardensville to Virginia segment of Corridor H.

18

55.   A number of comments on the SEA related to the project's impacts on the Tuscarora Trail, a long-distance recreational trail that traverses public lands in the Central Appalachians, including within the George Washington National Forest. In this area, it coincides with the Great Eastern Trail and is used for backcountry hiking and equestrian travel.

56.   The SEA recognized the Tuscarora Trail as a recreational resource, and the FONSI identifies the Potomac Appalachian Trail Club (PATC) as the entity that maintains the Tuscarora Trail, but did not identify the Tuscarora Trail as a resource protected by Section 4(f).   (FONSI, Response to Comments, Commenter 314.)

57.   At or near the eastern terminus of the Project, the Tuscarora Trail and Great Eastern Trail must cross the east-west WV Route 55 at grade to continue along their north-south route. Trail users have no practical way to traverse this segment without crossing WV Route 55.

58.   Corridor H will narrow to two lanes and merge with Route 55 in the approach to the Tuscarora trail crossing of Route 55.  The Project's eastern terminus was moved approximately 100 feet to the west to be farther from the trail. However, the SEA never identifies the impact of the additional traffic carried by the four-lane Corridor H as vehicles transition to merge on the two-lane Route 55 just before Route 55 crosses the Tuscarora Trail, which will increase the hazards to trail users, particularly to pedestrians and equestrians, attempting to cross WV Route 55 at grade.

59.     Specifically, the Project changes the traffic environment at the crossing in ways that materially increase the hazard and practical barrier to using the Tuscarora Trail and Great Eastern Trail at this location. A four-lane approach, the proximity of a merge and speed-change zone, and the resulting driver distraction and speed differentials materially increase risk for trail users crossing at grade, particularly in mountainous terrain with constrained geometry and limited sight distance. (See, e.g., FONSI, Response to Comments, Commenter 314.)

60.     The practical effect is to convert Route 55 into a barrier that prevents trail users from crossing Route 55, a predictable deterrent to use of this segment. When a required crossing becomes materially more hazardous, trail users, particularly pedestrians and equestrians, will avoid the crossing and are forced to reroute or avoid extraordinary safety hazards.

61.     Numerous SEA comments proposed feasible mitigation measures to address the access and safety problem, including a grade-separated trail crossing, relocating the merge zone farther from the trail crossing, implementing additional traffic calming and warning devices, reducing operating speeds, and evaluating grade-separated crossing options, among other measures. (FONSI, Response to Comments, Commenter 314.)

62.     Defendants' environmental documents and responses to comments fail to recognize this serious barrier to access and incorrectly assert that the Tuscarora Trail "will not be impacted or occupied" by the Project, and state that "the existing trail crossing of WV 55 and associated parking on the shoulder will be unaffected by the project." (FONSI, Response to Comments, Commenter 44.)

20

63. The sole measure incorporated into the Project – a new parking area/trail head near the Project – does not reduce the danger of crossing WV Route 55 at grade. It does not create safe passage across the highway and therefore does not mitigate the harm caused by Corridor H to the Trail.

64. Defendants also attempt to resolve the safety concern through conclusory assurances about the roadway transition design. Defendants state that traffic from the new four-lane highway "will begin to merge into two lanes approximately 1,600 feet downhill and west of the trail crossing," and conclude that "[t]here will be no change for trail users crossing US 48/WV 55 after construction." (FONSI, Response to Comments.)

65. These conclusions do not address the core safety and access problem that the administrative record squarely raises. For a long-distance trail, "access" is not limited to whether the trail tread is physically severed or whether a parking space exists. Access includes whether a reasonable trail user can safely reach and traverse the trail where the trail necessarily crosses a state highway to continue.

66. Moreover, the Defendants concede that the new parking location "would be on a graded portion of the future highway to be used temporarily as a parking area." (FONSI, Response to Comments.)  This parking area would be eliminated if Corridor H is constructed in Virginia.

67. On November 3, 2025, Defendant Rogers approved the Finding of No Significant Impact ("FONSI"), and determined that the construction of the Action Alternative will have no new significant impact on the human environment with the meaning

of NEPA and that a Supplemental Environmental Impact Statement of the May 5, 2003 Amended ROD is not required.

68. On January 6, 2026, the U.S. Department of Transportation issued a "Statute of Limitations" notice for the Appalachian Corridor H, Wardensville to Virginia State Line Project, providing notice than any claim seeking judicial review of the F project will be barred unless the claim is filed on or before June 4, 2026.

69. On information and belief, Defendants are now in the process of finalizing the design of the highway, now portraying Corridor H as being 7.2 miles in length, and are preparing to move forward with letting construction contracts for the project as rapidly as possible.

70. Absent equitable relief from this Court, the natural, scenic, and recreational resources in the surrounding area will be severely and irreparably harmed. Plaintiffs and their members have no adequate remedy at law, and they will suffer irreparable and permanent injury if they are not awarded relief by this Court.

COUNT I
(National Environmental Policy Act)
Failure to Evaluate Alternatives

71. Plaintiffs repeat and reallege the foregoing allegations.

72. The National Environmental Policy Act (NEPA) requires federal Defendants to prepare a detailed statement evaluating the environmental impacts of and alternatives to any proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

73. In both an EA and an EIS, Section 102(H) of NEPA requires federal Defendants to "study, develop, and describe appropriate alternatives to recommended courses

22

of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(H).

74. Under FHWA's regulations an EA must "identify alternatives and measures that might mitigate adverse environmental impacts."  23 C.F.R. § 771.19(b).

75. The Supplemental EA and FONSI prepared for the Wardensville to Virginia line segment is based on obsolete traffic data and studies conducted to support the purpose and need for the original, 100-mile Corridor H project, which were never updated to support the need for a four-lane highway for the 5.5-mile Wardensville to Virginia segment or the rejection of the alternative of making spot improvements to existing roads such as correcting horizontal and vertical alignments, adding truck-climbing lanes, and making intersection safety improvements to address the project goals.

76. When the current traffic counts for the segments of US 48/WV 55 in the Wardensville to VA line project area are compared with the projected future traffic counts for the "no-build" scenario in the 1996 environmental documents, it is clear that the 1996 projections of future traffic were wildly inaccurate.  *See e.g.* FONSI at 6  ("the 1996 FEIS estimated the 2013 projected traffic volume as 10,000 ADT. . . . The current [2025] volume of traffic on WV 55 at the WV/VA state line is 2,950 ADT.")

77. The failure to provide any supporting transportation studies and analysis has prevented the plaintiffs from being able to understand how the Defendants arrived at traffic projections that seem at odds with current trends, and prevents a true assessment of whether spot improvements to existing roads would address the

need for improved safety and mobility between Wardensville and the Virginia line.

78. The Commonwealth of Virginia's continued refusal to build the four-lane Corridor H in Virginia, and instead improve its existing roads from the West Virginia border to Interstate 81, confirms that improving existing roads is a viable, reasonable alternative that can satisfy the legitimate transportation needs for regional linkages and elimination of roadway deficiencies.

79. The alternative of making spot improvements is a reasonable alternative that would avoid harm to the Wardensville Historic District and to the many natural resources that would be impacted by the new highway.

80. The Defendants' failure to thoroughly evaluate the alternative of making improvements to existing roads was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA.

COUNT II
(National Environmental Policy Act)
Failure to Use Reliable Data to Evaluate Impacts

81. Plaintiffs repeat and reallege the foregoing allegations.

82. As amended, NEPA requires Defendants to "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," and "make use of reliable data and resources" in their environmental analyses. 42 U.S.C. §§ 4332(D) and E).

83. The baseline data in the original 1996 environmental documents prepared 35 years ago upon which the supplemental EA relies is now obsolete and cannot

24

provide a basis for evaluating the need for or alternatives to the Wardensville to Virginia segment of Corridor H.

84. The Defendants' decision to prepare a supplemental EA evaluating only changes since 2003 amended ROD and to rely primary on the environmental studies conducted more than 35 years ago as part of the environmental impact statement for the entire 100-mile Corridor H project was arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with NEPA and the FHWA's implementing regulations.

85. Accordingly, Defendants should be enjoined from any and all activities in connection with this project that may adversely affect West Virginia's unique natural, scenic, and historic resources until such time as Defendants have fully complied with NEPA.  Unless Defendants are so enjoined, plaintiffs and their members will be irreparably harmed.

COUNT III
(National Environmental Policy Act)
Failure to Prepare a Supplemental Environmental Impact Statement

86. Plaintiffs repeat and reallege the foregoing allegations.

87. Under the FHWA's regulations, a supplemental environmental assessment("EA") is prepared "to assess the impacts of the changes, new information, or new circumstances."  23 C.F.R. § 771.130(c) (July 3, 2025 final interim rule).

88. FHWA regulations further provide as "examples of actions that normally require an EIS: (1) A new controlled access freeway. (2) A highway project of four or more  lanes on a new location."  23 C.F.R. § 771.115(a).

25

89. The Wardensville to Virginia segment of Appalachian Corridor H will be a new, partially controlled access freeway with four or more lanes primarily on a new location.

90. The supplemental EA falls to adequately evaluate or give appropriate weight to significant changes that have occurred in the project area in the 35 years since the original environmental documents for Corridor H were prepared, including the new recognition of the endangered status of the long-eared bat and the wood turtle which is now being evaluated for endangered status, as well as to substantial growth of a tourism and outdoor recreation-based economy in the town of Wardensville, WV, which will be adversely affected by design changes that divert traffic away from the historic downtown commercial district.

91. The Defendants' decision not to prepare a supplemental EIS for the Wardensville to Virginia segment of Corridor H was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA.

92. Accordingly, Defendants should be enjoined from any and all activities in connection with this project that may adversely affect West Virginia's and Virginia's unique natural, scenic and historic resources until such time as Defendants have fully complied with NEPA and the FHWA's implementing regulations.  Unless Defendants are so enjoined, plaintiffs and their members will be irreparably harmed.

COUNT IV
(Section 4(f) of the Department of Transportation Act)
Failure to Undertake All Possible Planning to Minimize Harm to the Tuscarora Trail

93.   Plaintiffs repeat and reallege the foregoing allegations.

94.   Section 4(f) of the Department of Transportation Act provides, in relevant part, that the Secretary of Transportation:

*shall not approve* any program or project ... which requires the use of ... any land from an historic site of national, State, or local significance as so determined by such officials *unless* (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes *all possible planning to* minimize harm to such ... historic site resulting from such use.

23 U.S.C. § 138(a)(3)); *see also* 49 U.S.C. § 303(c).

95.   FHWA regulations further define the term "all possible planning" to mean "that all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects *must be included* in the project." 23 C.F.R. § 774.17 (emphasis added).

96.   FHWA regulations further define the term "all possible planning" to mean "that all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects *must be included* in the project." 23 C.F.R. § 774.17 (emphasis added).

97.   Under FHWA's Section 4(f) regulations, a Section 4(f) property includes publicly owned land of a public park recreation area. 23 C.F.R. § 774.17.

98.   A publicly owned trail or shared use path that is designated or functioning primarily for recreation is a Section 4(f)-protected property unless the official(s) with jurisdiction determines that it is not significant for such purpose. FHWA Section 4(f) Policy Paper, Q & A 15A.

27

99.   The FHWA regulations provide that a "use" of a Section 4(f) property includes constructive use.  Constructive use occurs where a transportation project does not permanently incorporate land from the Section 4(f) property, but proximity impacts are so severe that the protected activities, features, or attributes that qualify the resource for Section 4(f) protection are substantially impaired.

100.  The FHWA regulations recognize that constructive use occurs where, among other things, where "the project results in a restriction of access which substantially diminishes the utility of a significant publicly owned park, or recreation area."  23 C.F.R. § 774.15(e)(3).

101.  The Tuscarora Trail is a publicly owned trail that functions primarily for recreation, and is therefore a Section 4(f) property.

102.  The Project constructively uses the Tuscarora Trail and Great Eastern Trail at Great North Mountain. The Project's four-lane approach and terminus configuration, including the altered traffic environment in close proximity to the WV Route 55 crossing that trail users must traverse, materially increasing the safety hazards to accessing and using the trail at this location. That increased hazard will deter users, including groups, who will avoid the crossing and the affected trail segment altogether. This restriction of access will substantially diminish the trail's utility for long-distance backcountry hiking and equestrian use.

103.  The Defendants failed to meaningfully analyze whether these proximity impacts constitute a constructive use of the Tuscarora Trail and Great Eastern Trail under Section 4(f). Instead, the Defendants asserted, without a reasoned Section 4(f)

28

evaluation tied to the trail's utility and access conditions, that the trail will not be "impacted or occupied," that the existing crossing will be "unaffected," and that there will be "no change for trail users crossing US 48/WV 55 after construction."

104. The Defendants failed to incorporate any reasonable, feasible, and prudent alternatives or measures to avoid, mitigate, or minimize harm to the Tuscarora Trail's crossing of US 48/WV 55. The sole measure incorporated into the Project is a temporary parking area/trail head on the footprint of future highway construction. This temporary parking area does not in any way reduce or mitigate the barriers created by Corridor H to the ability of trail users to cross US 48/WV 55 to continue north and south on the trail.

105. The FHWA therefore violated Section 4(f) by failing to determine whether Corridor H would constructively use the Tuscarora Trail by creating safety hazards that effectively prevent the use of the trail as it crosses Route 55, and by failing to evaluate measures that would avoid or minimize harm to the trail.

106. By approving a Project design that omits any reasonable, feasible and prudent measures to mitigate the impact of the Project , such as an overpass of Route 55 for trail users, including but not limited to constructing a grade-separated crossing of the Trail over Route 55, FHWA approved a project that failed to include all possible planning to minimize harm to the Tuscarora Trail, including "all reasonable measures identified in the Section 4(f) evaluation." 23 C.F.R. § 774.17.

107. The Defendants' failure to identify and evaluate the Tuscarora Trail and Great Eastern Trail as Section 4(f) properties, and their failure to analyze and address constructive use of these trail resources, or measures to minimize harm to the

29

trail, was arbitrary, capricious, an abuse of discretion, and not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2).

108. Administrator McMaster, Division Administrator Rogers, and Secretary Duffy should be enjoined from providing federal funding to the Project in violation of Section 4(f). Unless they are so enjoined, Plaintiffs and their members will be irreparably harmed.

109. Commissioner Rumbaugh should be enjoined from further planning, acquisition of right-of-way, financing, contracting, or construction of the Project in violation of Section 4(f). Unless Commissioner Rumbaugh is so enjoined, Plaintiffs and their members will be irreparably harmed.

RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1. Declare the obligations and duties of Defendants to comply fully with the requirements of NEPA and Section 4(f) prior to any further planning, financing, contracting, or construction of the project;

2. Vacate FHWA's November 3, 2025 FONSI approval of the Project;

3. Issue preliminary and permanent injunctive relief directing Defendants to refrain from any further planning, acquisition of right-of-way, financing, contracting, or construction of the Project that is not fully compliant with the requirements of the APA, NEPA, FHWA regulations and Section 4(f);

4. Award the cost of this action, including reasonable attorney's fees, costs, and disbursements pursuant to applicable laws, including but not limited

to the Equal Access to Justice Act; and

5.      Award such other relief as this Court may deem appropriate.

Respectfully submitted,


_/s/ Bradley W. Stephens_____
Bradley W. Stephens (WV State Bar #9930)
Stephens Law Office
P.O. Box 490
Morgantown, WV 26507
(304) 680-4055
stephens.law.office@gmail.com



__/s/ Andrea C. Ferster_____
Andrea C. Ferster (D.C. Bar #384648)
Law Offices of Andrea C Ferster
(seeking admission *pro hac vice*)
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-631
Email: andreaferster@gmail.com